

# LaRusso, Conway & Bartling
### ATTORNEYS AT LAW

September 3, 2020

Hon. Nicholas G. Garaufis
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, N.Y. 11201

    Re: United States v. Frangesco Russo
      Criminal Docket No. 20-CR-0306(NGG)

Dear Judge Garaufis:

Defendant Frangesco Russo ("Russo") respectfully submits this letter seeking reconsideration of the denial of his bail based upon the Court's finding that Mr. Russo posed a danger to the community. Having the opportunity to investigate the facts further, we respectfully submit that, based, in part, on new information, the facts clearly show that Mr. Russo did not, nor does he, pose a danger to the community. We respectfully request that we have an opportunity to argue this motion at the scheduled September 9, 2020 status conference previously set by the Court.

## I. **PROCEDURAL BACKGROUND:**

On August 18, 2020, Mr. Russo was arrested, along with three other individuals on a Twenty-One Count Indictment which alleges violations of wire fraud and extortion. In connection with his arrest, the Government filed a 34-page detention memorandum requesting the detention of Mr. Russo and the other three co-defendants, including Mr.

300 Old Country Road
Suite 341
Mineola, New York 11501

Telephone (516) 248-3520
Facsimile (516) 248-3522
www.larussoandconway.com

Russo's partner Frank Smookler ("Smookler").[1] Despite its request to have Mr. Smookler detained, the Government agreed to a bail package and he was released that day. Mr. Russo was the last defendant to be arraigned and have a bail hearing. The hearing was held before the Hon. Magistrate Lois Bloom and, after both sides presented their case, the Court set bail at a 1.5 million dollar bond secured by property in that amount.[2] However, the Government sought a stay of Magistrate Bloom's decision to appeal to the District Court Judge assigned to the case. Given the lateness of the hour (it was approximately 6:30 pm), argument on the Government's appeal was scheduled for the following day and Mr. Russo was held overnight. On August 19, 2020, the parties appeared via telephone before this Honorable Court. After argument by both sides,[3] the Court ruled that, based upon the evidence proffered by the Government, Mr. Russo was a danger to the community and as such overturned the Magistrate's ruling and ordered Russo detained.

## II. **DISCUSSION:**

The Bail Reform Act directs Courts to order a defendant detained pending trial if "no condition or combination of conditions would reasonably assure the appearance of the person as required[4] and the safety of any other person and the community." 18 U.S.C. Section 3142(a). A finding of dangerousness must be supported by clear and convincing evidence. United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). Here the

---

[1] Specifically, in their opening paragraph of their detention memorandum the government requested permanent orders of detention of Mr. Russo and co-defendant Frank Smookler. It also requested that the Court detain the other two co-defendants unless they submit substantial bail packages.
[2] Properties belonging to his brother, mother and mother-in-law were posted and the Court was able to speak to them and all agreed to post the respective properties and have their names affixed to the bond.
[3] The bail package put forward by Mr. Russo was increased to a 2.5 million dollar bond secured by the three properties previously put forth and two additional properties put forth by his brother and longtime friend which totaled 2.5 million dollars.
[4] Although the governments detention memo included risk of flight, the Government has abandoned that argument telling the Court that based solely on risk of flight they would not have appealed the Magistrate's decision.

Government's argument is that Mr. Russo poses a danger to the community based upon threats he made over the telephone toward another individual, Greg Altieri ("Altieri"), who, although not a defendant in this case, is charged in a separate indictment pending in the Eastern District with master-minding a 100 million dollar Ponzi scheme.[5] Altieri plays a very prominent role in this case.

Upon further investigation and the discovery of additional information, as well as a more-thorough review of the governments claims, we respectfully submit that the sequence and timing of the pertinent facts clearly show that Mr. Russo was not, and is not, a danger to this particular person, nor is he a danger to any other individuals or the community as a whole.

The threats alleged by the Government in their proffer and detention memorandum were directed at Greg Altieri.[6] Beginning in 2018, and continuing to December of 2019, Mr. Russo, and some of the co-defendants, via their company JBMML,[7] entered into a series of business transactions whereby they advanced monies to Altieri for his use in his jewelry business. In total, there were some 14 different transactions which were all in writing and memorialized by signed written contracts. This business arrangement continued to December 2019, when Altieri began to default on his payment obligations. Based on the default, JBMML, through legal counsel, was able to secure (as were some other entities that also entered into business transactions with Altieri) a confession of judgment for the outstanding monies which, with attorneys fees, was approximately 65

---

[5] On July 9, 2020, Mr. Altieri was indicted (Cr-20-249 (J. Cogan) in a one count indictment charging him in a 100 million-dollar wire fraud scheme. Mr. Russo and Mr. Smookler were victims of Altieri, along with other individuals, and unknowingly invested approximately 50 million dollars in Altieri's fraudulent scheme.

[6] In their 34-page detention memorandum the government does write five lines on an alleged threat to a second individual. In both the memorandum and in oral argument the Government has not disclosed where or to whom this threat was made, or whether they even relate to this case.

[7] JBMML is a Merchant Cash Advance business with its main office in Syosset, New York.

million dollars. Shortly thereafter, given the terms of the contracts between JBMML and Altieri, Mr. Russo and Mr. Smookler were able to review Altieri's bank statements and attempted to trace the monies of their business dealings. Based upon the review of the banking records, Mr. Russo and Mr. Smookler realized that Altieri had been doing business with numerous other people who were likewise victims of Altieri's Ponzi scheme.

In February 2020, after contacting some of the other investors, a meeting was held with these individuals and Altieri. Altieri personally represented that the monies were forthcoming and that the delay in repayment was based on a "glitch" at the bank. Within a week or two later, Altieri came to Mr. Russo and Mr. Smookler and told them that some of the other investors had beaten him up and attempted to cut his finger off.[8] Altieri begged Mr. Russo and Mr. Smookler for additional funds claiming he needed between 200-300 thousand dollars because if he (Altieri) didn't pay these people he was afraid that they were going to come back and assault him again. Despite their reluctance, and not wanting to see Altieri potentially killed, Mr. Russo and Mr. Smookler arranged for a $250,000.00 loan so Altieri could payoff those threatening to harm him.[9]

On information and belief, this money came from a third party, a legitimate businessman, who had previously advanced monies within some of the 14 different contracts we previously described above. In late February, early March 2020, Altieri was provided with the $250,000. Per the terms of the agreement, Altieri made his first two

---

[8] In the detention memorandum, at page 23, the Government wrote "Smookler and Russo knew that Altieri had gotten hit in the face with a wrench by one of his creditors." We are in possession of a photo Altieri sent to Mr. Russo with a date of February 25, 2020, which shows a disheveled Altieri with a cut on his nose.

[9] This is confirmed on page 22 of the Government detention memo when they recite Mr. Smookler and Mr. Russo told Altieri they had borrowed the $250,000.
4

payments (each payment was $40,625.00 dollars). However, Altieri made no further payments and defaulted on the loan. Both Mr. Russo and Mr. Smookler, through JBMML, made the next two payments, and sent two separate wire transfers totaling $81,250.00 to the individual who loaned the $250,000.

In its detention memorandum and in their argument to the Court, the Government cited a litany of threats by both Mr. Russo and Mr. Smookler against Altieri for his failure to repay this $250,000 loan. As an initial matter, the facts reveal that Altieri has absolutely no fear of Mr. Russo and was actively calling him, and, at times, leaving messages to speak with Mr. Russo. Furthermore, Altieri had no fear of Mr. Russo and Mr. Smookler because after Altieri was allegedly beaten, Altieri came to them for help. Although Altieri was in default on the earlier contracts and they held a confession of judgment, Mr. Russo and Mr. Smookler agreed to try and help Altieri based upon the threats to his life. Mr. Russo and Mr. Smookler believed the threats to be valid.

After Altieri defaulted on the $250,000, one can only imagine Mr. Russo and Mr. Smookler's utter frustration at having been" duped" again, and now obligated to make payments to cover the $250,000 loan. However, a closer look at the alleged threats, alongside the additional facts that we now possess, show that Mr. Russo, although extremely frustrated, angry and upset, was speaking with bluster, using bombast and bravado language, and engaging in empty talk to convey his feelings and thoughts to Altieri. Most importantly, in the one recording the government deemed "terrifying," (Tr. 8/19/20 at page 4, line 22), Mr. Russo was attempting to warn and help Altieri, and clearly not threating him.

5

The Government's position that Russo is a danger to the community relates to Counts 18-21 of the Indictment, which allege conspiracy to commit extortionate collection of credit. In pages 22-24 of the detention memorandum, the Government refers to several threatening telephone calls attributed to Mr. Russo and Mr. Smookler. These calls take place between March 2020 and May 20, 2020.

During a telephone call on an unspecified date in March, the Government proffered that Mr. Russo threatened Altieri and told him that he had just purchased a "**few** tactical shotguns . . . with lasers… not that you need a laser on a shotgun." (Gov't Detention Memo, pg. 23) (Emphasis added). During a search of Mr. Russo's home, the government recovered one tactical shotgun, not a "few" mentioned in the telephone call. This shotgun, which was unloaded (although ammunition was found in the home), was purchased in early 2017 from a licensed firearm's store in Suffolk County, Long Island. New York law clearly authorizes the purchase and possession of this weapon. It was not illegal for Mr. Russo to own and possess the shotgun in his home.

Furthermore, it is respectfully submitted that a test of this rifle will show that it has never been fired. Significantly, after the call referencing the shotgun, Altieri continued to call Mr. Russo, demonstrating that Altieri was neither fearful of Mr. Russo nor in any danger. Telephone records indicate that during this March to May 20, 2020 period, when Mr. Russo is allegedly threatening Altieri, more than 15 calls are made by Altieri to Mr. Russo, some resulting in voice messages exhibiting "no" tone in Altieri's voice or language of fear. Common sense dictates someone who is allegedly receiving "death-threats" normally does not attempt to reach out to the person making the alleged threats.

6

The Government also relies on two additional telephone calls in the detention memorandum in support of its claim that Mr. Russo made threats to Altieri. The first is on March 31, 2020 and the second is May 6, 2020. In both instances, within a day or two of the alleged threats, Altieri makes several attempts to call Mr. Russo.

From the first call on March 31, 2020, which appears on the bottom of page 23 of the detention memorandum, it seems uncertain if Mr. Russo is even a participant in this call. However, records indicate that Altieri called or attempted to call Mr. Russo 2 days after the March 31st conversation.

On page 24 of their memorandum, the Government cites a May 6, 2020 call. It is this call that the Government argued Mr. Russo made a "terrifying" threat[10] that justifies and supports its position that Mr. Russo is a danger to the community. However, a closer look at the call reveals otherwise. As recited in the memorandum,[11] in the first paragraph of page 24, the Government first references an earlier call between Mr. Smookler and Mr. Altieri which took place on May 5, 2020. Again, from a reading of the government's detention memorandum, it is believed that Mr. Russo was not a participant in the conversation.

Following up on this call, the Government quotes from the May 6, 2020 conversation where Mr. Russo told Altieri,

> "the threat to your family was imminent, and that if he loved his daughter, son, and wife, then Altieri **should go to the police and get them out of the house.**" (Emphasis added).

---

[10] This was the language cited by the government at the August 20, 2020 bail hearing before this Court. (Tr. 8/19/20 page 5).

[11] On August 20, 2020 we provided the Government with both an email and a letter requesting copies of the tapes as well as the affidavits and line sheets involving the wiretaps. We have not received any discovery to date, but in fairness, it has been less than two weeks since our request.

However, relevant to our position that Mr. Russo was never a danger to Altieri or the community, the above conversation continued, and, in response to a question from Altieri "what would happen to his family," Russo replied,

> "**they**'re going to make you watch as they rip your son's teeth out of his mouth, watch **they**'re going to do worse things to your wife." (Emphasis added).

In this call Mr. Russo claimed "they" were coming for Altieri's family. While this sounds, and is no doubt terrifying, it cannot be any clearer that it is not Mr. Russo making the threat. First, as we stated above, Altieri had numerous victims who were all angry with him. One or more of these victims have already beaten him with a wrench and clearly threatened to do further harm. It was Mr. Russo and Mr. Smookler who Altieri came to for help and Mr. Russo and Mr. Smookler who in fact helped him by providing the $250,000 loan. Moreover, the threat in the above call relates to the people who allegedly harmed Altieri, and not regarding the failure to pay $250,000. Mr. Russo was not making the threat. Mr. Russo was warning Altieri that the threat was imminent and coming from the individuals who allegedly assaulted Altieri.

Furthermore, it is Mr. Russo who tells him to go to the Police and get his wife and kids out of the house. Does that sound like someone who is doing the threatening, or does it sound like someone warning of a threat coming from another party. Lastly, per the telephone records, Altieri called or attempted to call Mr. Russo three times on May 7, 2020, which is the following day. Common sense dictates that if Altieri for one minute believed the threats were coming directly from Mr. Russo, there is no chance whatsoever, he would be trying to call Mr. Russo the next day. Altieri stayed in contact with Mr. Russo and it is clear Mr. Russo, in this conversation (referencing "they're several times

8

as opposed to us or me) was talking about those people who had previously beaten and assaulted Altieri. As such, it is clear Altieri never perceived Mr. Russo and or Mr. Smookler as a threat.

As set forth in the detention memorandum, despite having an on-going wiretap into July 2020, the last call between Altieri and Mr. Russo, as well as Mr. Smookler, was on or before May 20, 2020. Altieri was arrested on July 10, 2020, a period of over 50 days from the last conversation between Altieri and Mr. Russo reported in the memorandum.

As mentioned, based on information and belief, the wiretaps in this case extended into July 2020. However, the bail detention memorandum is devoid of any additional calls between Altieri, Mr. Russo and Mr. Smookler after the May 20, 2020 call. The reason for such was that on April 28, 2020, three creditors, other than JBMML, filed an involuntary bankruptcy against Altieri. On May 5, 2020, JBMML, through legal counsel, filed their confession of judgement in bankruptcy court. On or about May 16, 2020, Altieri filed a financial statement in the bankruptcy case which purported to show he had very little if any assets. Lastly, on May 19, 2020, the trustee appointed in bankruptcy court filed a lengthy and detailed complaint setting forth Altieri's crimes. Thus, on or about May 20, 2020, when the calls between Mr. Russo and Altieri end, it is clear Mr. Russo and Mr. Smookler realized that it would be futile to have any additional contact with Altieri. Therefore, based on the above outline its clear that Russo was not a danger to Altieri prior to May 20, 2020, and certainly has not been and is not at all, a danger to him now.

This Court, in detaining Mr. Russo, opined "I think this is a hard decision to make." (Tr. 30,31). The Court focused on two specific considerations, the tactical shotgun and the nature of the threats. We respectfully submit that the threats, relied upon by the government, when no longer viewed in a vacuum but instead now been placed in context, show that it was others who were making these "terrifying" threats and who had assaulted Altieri, not Mr. Russo. In fact, Mr. Russo encouraged Altieri to go to the police, conduct inconsistent with being the person responsible for making the threats.

Furthermore, showing the exaggerated nature of his statements to Altieri, Mr. Russo mentioned in the conversation that he had a "few tactical shotguns," as the government sets forth in their brief, when in fact the evidence showed that Mr. Russo purchased a single shotgun three years ago. Based on this new information, we respectfully submit that the government does not possess by clear and convincing evidence that Mr. Russo possess a danger to anyone.

Lastly, although this argument was raised below, Mr. Russo's incarceration, for what may be a lengthy pre-trial period, will undoubtedly impact his ability to participate in his defense. Since his incarceration, some 13 days ago, counsel has not had the ability to meet with him face to face. While we have been granted access telephonically (between his arrest and today we have been granted 2 one-hour phone calls), we have no ability to show him any documents or to have him provide us vital information on the documents we do possess. While we certainly hope and pray that this pandemic will end sooner as opposed to later, incarceration at this time makes it extremely difficult for us to communicate with our client and to have him have meaningful input into his defense.

## CONCLUSION

The Government's detention memorandum and bail proffers clearly show that Altieri was the subject of threats and some of them vile. It also acknowledges that Altieri was the victim of an assault from people other than Mr. Russo. However, based upon a full review of the history of the parties herein, Altieri's heinous acts, which resulted in numerous people being defrauded of millions of dollars, and the timing of the events as specified above, it is crystal clear that, while Mr. Russo was certainly frustrated and upset, and certainly made imprudent comments, these comments were made in utter frustration as to Altieri's actions and these comments were nothing more than bravado made with no intention of doing any harm to Altieri. Furthermore, the facts show that it was Mr. Russo who Altieri came to for help and despite what the Government claims were Mr. Russo's terrifying threats, Altieri continued to call him. A case can be made that it was in Mr. Russo's best interest to make sure Altieri was unharmed so he could hopefully make good on the confession of judgment. Once it became clear in the bankruptcy filings that payment was not going to be possible, Mr. Russo and Mr. Smookler ceased all further contact with Altieri. As such, we respectfully submit that Mr. Russo is not a danger to Altieri or to the community and based upon the substantial bail package proposed, and in conjunction with the Government's consent to the other bail packages, that Mr. Russo be released on the bond we have set forth.

Respectfully Submitted,

Robert P. LaRusso
Joseph R. Conway, Esq.

cc: AUSA'S Andrey Spektor/Lindsay K. Gerdes

11