

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AES:LKG/AS
F#: 2020R00291

271 Cadman Plaza East
Brooklyn, New York 11201

September 7, 2020

By ECF and Email

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Chierchio, et al.
               Criminal Docket No. 20-306 (NGG)

Dear Judge Garaufis:

      The government respectfully submits this letter in response to defendant Frangesco Russo's motion to reconsider this Court's order to remand him pending trial ("Mot."). Russo remains too dangerous and too much of a flight risk to be released into the community while he awaits trial, no matter what bail package he can offer. Indeed, his continued failure to acknowledge—much less take responsibility for—his repeated lies to Pre-Trial Services shows that he cannot be trusted. His "new" claims recycle his old arguments and fail for the reasons already articulated by this Court. Russo is not any less dangerous because his laser-mounted shotgun had not been fired or because it was the only such tactical weapon he possessed. He still threatened to murder a person and his family. There are no new circumstances that warrant revisiting the Court's decision and no factors that it overlooked; the motion to reconsider should be denied.

I.     The Court's Decision to Remand Russo

      The government sought Russo's detention because he (1) threatened to hurt, shoot, and kill Gregory Altieri and his family, including with the type of tactical shotgun the arrest team recovered under Russo's bed, (2) threatened at least one other person, (3) repeatedly lied to Pre-Trial Services, (4) participated in a $107 million fraud scheme against lottery winners, and (5) faces the prospect of a decade-long prison term for fraud- and extortion-related offenses. See ECF No. 9. ("Detention Ltr."). With its detention memorandum, the government submitted a photograph of Russo's shotgun, which it had seized during his arrest:



The Court weighed all these factors in favor of detention, focusing in particular on the nature of Russo's threats and his specific reference to the weapon pictured above:

> In this case, I'm looking at a very dangerous weapon, and I'm looking at an individual who has allegedly been recorded as saying that, "I have a tactical shotgun. If anything gets crazy with you guys, just come straight here. I have all the lights on, I will tactically shoot everybody's kneecaps off. I'm not worried." And then we also have this discussion about yanking the teeth out of someone's son's mouth. You know, I have handled organized crime cases for 20 years. I've never run across that kind of a threat [counsel's interruptions omitted] in 20 years . . . . That's something new to me. And it's very troubling that we have someone here who is allegedly in possession of a tactical weapon. . . . . I deem anyone who's got a tactical shotgun with a laser under his bed [and] is accused of having made threats which refer to such a weapon, that that's an extremely concerning issue, and that the Court can't view that as just hyperbole or that you say around the bar with your friends.

Transcript of August 19, 2020 Bail Hearing ("Bail Tr."), 19:11-21:3. Later in the proceeding, the Court again rejected the idea that Russo's threats were mere "bravado," noting that they were "serious threats," particularly since they were made in the context of extortion. Bail Tr. 30:17-18. "[T]hese comments demonstrate, along with the seized weapon and ammunition, . . . that the defendant . . . constitutes a threat to the community." Bail Tr. 31:7-10.

The Court also noted that Russo presents a significant risk of flight.[1] He could

---

[1] Russo mistakenly claims that the government has "abandoned" its risk-of-flight argument. Mot. 2, n.4. It has not. In our detention memorandum, we conceded that while all four defendants had the incentive and means to flee, "Smookler pose[d] the greater flight risk," Detention Ltr. 30, and Russo posed the most danger, id. 31. We also acknowledged to Your Honor that the government rarely appeals adverse bail decisions by magistrate judges, but did so in this case because of Russo's danger to the community. Bail Tr. 3:25-4:2. These candid disclosures to the Court about the government's considerations did not detract from its concern about Russo's flight risk, which the government argued also weighed in favor of detention. See Detention Ltr. 29-31. In any event, during the bail appeal hearing, the Court noted that it did not

have access, the Court explained, to unknown assets—like the unexpected $80,000 or so in cash the government found in Russo's house, Bail Tr. 28-7-8—which he could use to flee before Pre-Trial Services or the government would receive notice. Bail Tr. 24:1-24-21.

The Court also noted Russo's lies to Pre-Trial Services, observing that Russo's threats were not its lone concern. Tr. 25:6-17. In particular, the Court was troubled that Russo purposefully omitted his assets, claiming to have just $15,000 in his checking account and a monthly cashflow of about $4,400. See Pretrial Services Report at 3. As the government noted, Russo failed to disclose, among other things, ownership in houses worth millions of dollars, boats, and a bank account with about $185,000. Tr. 7:5-22. While Russo tried to portray himself as a middle-class individual with modest assets, his lavish lifestyle—funded by fraud—was anything but modest. The government noted one telling comment Russo made to Kurland as the co-conspirators discussed scaling back their spending given the FBI's investigation: "You know, I don't need the helicopters, you know, maybe I take a private jet once a year to Florida with the family." Detention Ltr. 19.

II.     Russo's Motion to Reconsider

In his motion to reconsider, Russo does not dispute that he made death threats, that he lied to an arm of the Court, or that the evidence of his crimes is short of overwhelming. Instead, he argues that "further investigation and discovery of additional information," Mot. 3, have revealed his threats as mere "bluster, using bombast and bravado language," Mot. 5, all uttered in frustration over Altieri's failure to pay a so-called "legitimate" loan, Mot. 4-5. Russo adds that he was actually trying to help Altieri, not hurt him. Mot. 5.

In support, Russo points to his reference in one call to "a few tactical shotguns with lasers," Mot. 6, and believes this observation is significant because the Federal Bureau of Investigation ("FBI") only recovered one such tactical shotgun. Id. Russo also finds it compelling that the laser-mounted shotgun might not have even been fired before and was lawfully purchased, though he acknowledges that the FBI recovered from his house ammunition for this particular weapon. Id. And, he continues, Altieri was the one to initiate some phone calls—a fact from which he extrapolates Altieri's apparent lack of fear: "Common sense dictates someone who is allegedly receiving 'death threats' normally does not attempt to reach out to the person making the alleged threats." Id. Russo continues to argue that the Court should discount or dismiss entirely one of his threats—when he told Altieri that "they" were going to pull Altieri's "son's teeth out of his mouth, [and] watch they're going to do worse things to your wife." Mot. 8. In conveying the gravity and imminence of that threat, Russo recommended to Altieri that he seek immediate protection from the police. Id. Russo draws on his statements about law enforcement to suggest that he was in fact protecting Altieri from some third party, though he does not identify who that person(s) might be. Id. Finally, Russo highlights the timing of the threats, because he believes it relevant that his threats ended in late May 2020. Mot. 9.

---

have to address the issue of flight (though it was troubled by it, too) because the government clearly and convincingly established Russo's dangerousness.

3

These assertions are either misleading or nonsensical—or both.

III.   Legal Standard

Although the Federal Rules of Criminal Procedure do not provide for motions for reconsideration, "courts have generally allowed such motions and have analyzed them under the applicable rules and standards for motions for reconsideration in civil cases." United States v. Spataro, No. 04-CR-911 (SJ), 2009 WL 10718509, at *1 (E.D.N.Y. Oct. 15, 2009). Local Civil Rule 6.3 requires the moving party to set forth "the matters or controlling decisions which counsel believes the court has overlooked."

"Reconsideration . . . 'is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" Espinal v. United States, No. 08-CR-242 (ARR), 2020 WL 702579, at *2 (E.D.N.Y. Feb. 12, 2020) (quoting In re Facebook, Inc., IPO Secs. & Derivative Litig., 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014)). Accordingly, "'[t]he standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" United States v. Kenner, No. 13-CR-607 (JFB), 2019 WL 6498699, at *11 (E.D.N.Y. Dec. 3, 2019) (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995), and citing Medoy v. Warnaco Employees' Long Term Disability Ins. Plan, No. 97–CV–6612 (SJ), 2006 WL 355137, at *1 (E.D.N.Y. Feb. 15, 2006) ("The standard . . . is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the Court.")). In other words, "a party seeking reconsideration is 'not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings." De Los Santos v. Fingerson, No. 97-CV-3972 (MBM), 1998 WL 788781, at *1 (S.D.N.Y. Nov. 12, 1998).

As a result, on an appeal from a motion to reconsider bail, the Second Circuit looks not to the merits of the district court's original decision, but to its consideration of the new information or law brought to its attention. See, e.g., Fan v. United States, 710 F. App'x 23, 24-25 (2d Cir. 2018) (citing Malik v. McGinnis, 293 F.3d 559, 561 (2d Cir. 2002) (observing that appeal of an order denying a motion for reconsideration "brings up for review only the denial of the motion and not the merits of the underlying judgment")). See also id. at 24 ("[The defendant] identifies no question of overlooked law or fact that could overcome the multiple layers of deference we apply to a district court's denial of a motion for reconsideration of bail in an action alleging ineffective assistance of counsel."); United States v. Cirillo, 149 F. App'x 40, 42 (2d Cir. 2005) (noting that a court correctly denied reconsideration of bail by noting defendant's "failure to point to any law or facts overlooked by the court at the time it initially ordered [his] detention, or to any clear error of law or manifest injustice.").

IV.    Analysis

   A.    Russo Has Not Identified Any Fact or Law the Court Overlooked

The Court could deny Russo's motion on a procedural ground alone: he has failed to identify any new fact or controlling law that warrants reconsideration. The thrust of Russo's argument is that his threats to Altieri were mere puffery, that they ended in May 2020, and that he is not dangerous because he has no criminal history. The Court has already heard all of these arguments, and it rejected them. If Russo believes the Court erred, he could have appealed the bail determination to the Second Circuit. The avenue he chose requires him to identify something the Court overlooked, and the Court has overlooked nothing. See, e.g., Fan, 710 F. App'x at 24-25; Cirillo, 149 F. App'x at 42.

   B.    Russo's Arguments Only Reinforce the Court's Decision to Detain Him

Even if the merits of Russo's detention are argued anew, the Court should reaffirm its decision. Russo attempts to defend his threats against Altieri by claiming that (1) Altieri was a fraudster who had been assaulted by other investors, Mot. 4 & n.8, (2) Russo (and Smookler) tried to help him by extending him a $250,000 loan from a "legitimate" person, under particular "terms," Mot. 4, and (3) Russo's threats were mere bluster, made out of frustration by someone who felt betrayed by Altieri, Mot. 5.

Russo ignores facts that are inconsistent with his arguments. Although Altieri may have received a loan of $250,000,[2] Russo and Smookler were expecting him to pay back about $415,000 to $425,000, of which $325,000 would go to the "legitimate" originator of the loan. In intercepted conversations, Russo and Smookler reminded themselves that out of the two $53,750 payments Altieri made on the loan, Russo and Smookler took $12,500 each time for themselves, and that under the terms of the loan, Altieri had about 8 to 12 weeks to pay back the entire amount. Thus, to take the most favorable assumptions for Russo, the loan he and Smookler had extended Altieri would have an interest rate of 66%, if Altieri had a year to pay it back. But the co-conspirators gave Altieri, at most, 12 weeks to repay it, meaning the loan had an annualized rate of well over 200%. This was classic loansharking, which is unlawful precisely for the reasons demonstrated by this case—Russo could not resort to lawful means to collect on a usurious loan, and had to do so through extortion, including by threatening to kill Altieri's family with Russo's tactical shotgun. As for merely trying to "help" Altieri, Russo omits the substantial "fees" he and Smookler collected from Altieri for their "services." In short, even if the legitimacy of a loan could justify Russo's extortionate efforts to collect it, his argument would fail; the usurious loan was just another way for Russo and Smookler to make money through illicit means.

As for Altieri's purported lack of fear, there are at least three flaws in Russo's argument. *First*, whether or not Altieri was actually scared of Russo makes no difference, either

---

[2] The calculation above assumes that Smookler and Russo took no fees when initially extending loan. The government is investigating whether they withheld about $20,000 from the $250,000 loan.

5

in establishing Russo's guilt or in determining his dangerousness.  Cf. United States v. Gambino, 566 F.2d 414, 419 (2d Cir. 1977) ("That the victim may be made of unusually stern stuff or that he may, in fact, be a federal agent is quite irrelevant to a permissible finding that there has been an attempt to instill fear.").

*Second,* Russo's own representations confirm that Altieri was terrified.  Russo writes that by the time Altieri turned to Russo and Smookler for help, some of Altieri's investors had attempted to cut off Altieri's finger, and that he had been assaulted with a wrench.  Mot. 4 & n.8, Mot. 8.  Yet despite this beating, Altieri chose to repay Russo and Smookler, at least partially (over $80,000 by Russo's count, Mot. 4-5).  Altieri's decision was rational:  he chose to expose himself to additional threats and assaults by other investors over Russo's promise to execute Altieri and his family with his laser-mounted shotgun.

*Third*, Russo's assertion that threatened victims do not return calls to the individuals making the threats is absurd—ignoring someone like Russo might well have earned Altieri a visit at home where Russo knew Altieri and his family lived.  Regardless, the government proffers that at least some (and perhaps most) of the calls that Altieri placed to Russo in the period Russo identifies, Mot. 6, were made consensually after the FBI began monitoring these communications.  As the government noted to the Court, when the FBI learned of the threat to Altieri and his family, it took protective measures until Russo was arrested.  Bail Tr. 17:23-24.[3]

Russo also continues to assert that his threats ended in the end of May, implying that Russo had been a law-abiding citizen for the two-and-a-half months leading up to his arrest.  Even if that argument was persuasive—defendants are frequently detained based on crimes committed many months or years earlier—it rests on a faulty premise; Russo threatened another individual after May.  In a footnote, Russo briefly acknowledges his conduct towards this person, but dismisses it because the "the Government has not disclosed where or to whom this threat was made, or whether they [sic] even relate to this case."  Mot. 3 n. 6.  Again, the argument is legally flawed; Russo invites the Court to make clear error by requiring a connection between his threat and his charges.  See, e.g., United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991) (reversing the district court's dangerousness determination because the lower court required a nexus between the dangerous conduct to the activity charged; observing that "[w]e have never required such a nexus, nor do we impose such a requirement today. The issue is whether a defendant poses a danger to the community.").

The argument is also factually inaccurate.  The government not only proffered that Russo threatened another person, it quoted Russo.  See Detention Ltr. 31.  On July 29, 2020—just weeks before he was arrested—Russo told another individual, "I'm coming straight for your fucking middle of your eyes, watch what I do to you, you scumbag."  Detention Ltr. 31.  This was one example, but there are others.  For instance, the following day, Russo told this

---

[3]     The government extended the wiretap period until almost the day of Russo's arrest, in part to make sure Russo did not commit additional crimes that would have required the FBI's intervention.  Russo and Smookler made threats to Altieri during consensually-recorded conversations and meetings monitored by the FBI.

person, "I don't know who you are, you are somebody, huh?" The person responded defensively, "I'm a nobody Frank." Russo continued: "No, no, no, no, you're a half a rat, I know, I know a lot about you, and, and, and you'll see in person, how, how I view it. . . . So we'll see you half a rat, we'll see. Call everybody cuzzi! You hear me?" The person tried to interject, but Russo, as he did with Altieri, invoked his father, "JoJo" Russo, a Colombo crime family captain:

> My father died in Lewisburg prison you know nothing about what I know, I'm gonna teach you a thing or two, you fucking jerk off! You hear me? . . . . Watch how it has something to do with you! Watch how close it comes home to you! You think I give a fuck?

It is simply inaccurate to claim, as Russo does, that his threats ended in May and that they were focused only on Altieri.

Russo's remaining contentions require little attention. Neither the government nor the Court has suggested that Russo previously shot his shotgun or that he purchased it unlawfully. Mot. 6. Nor does it matter that Russo told Altieri he had multiple tactical, laser-mounted shotguns, even though only one such shotgun was recovered from him. None of these facts would provide much comfort to any victim, particularly since Russo had ammunition for this weapon, and was apparently ready to use it. As he told another person in June 2020, "I have a tactical shotgun, if anything gets crazy with you guys just come straight here, I have all the lights on, I will tactically shoot everybody's kneecaps off, I'm not worried." When the person asked, "You have something to shoot?" Russo responded that he did, "I have a very rare laser sight on a shotgun which is hard to find . . . a tactical shogun which is very scary to look at, and it can hold 13 actual shells in it." Detention Ltr. 31. Likewise, in a June 2020 text-message exchange with his mother, Russo said that in some confrontation with his neighbors, "I brought my shotgun. U think I'm kidding[?]" His mother responded, "Im sure youre not kidding."

Finally, Russo continues to find significance in the distinction drawn by Judge Bloom between Russo personally pulling Altieri son's teeth and Russo's referring to others who were apparently prepared to do so. Det. Ltr. 24; see also Transcript of August 18, 2020 Bail Hearing (Judge Bloom remarking, "I don't think he ever was quoted as saying that he would rip out the teeth. I think he was saying that the other people that were owed the money were animals and that they would do that."). The government opened its argument on appeal by alerting the Court to this meaningless distinction; whether Russo promised to personally torture Altieri's family or feigned concern over others coming to inflict this pain, the message was the same. Russo wanted Altieri to fear him, so that Altieri would repay the debt. The teeth-pulling warning was just one of the many terrifying statements Russo made to Altieri. See Detention Ltr. 22-24, 31-32. He also, for example, warned Altieri that he would "murder" his entire family. Id. at 32. In isolation and in combination, these threats—coupled with the weapon recovered from Russo, the other criminal conduct with which he is charged, and his repeated lies to Pre-Trial Services— are more than sufficient to find that Russo cannot be trusted, and that, as a result, no bail conditions will protect the community.

V.	Conclusion

   For the foregoing reasons, the Court did not overlook any fact or controlling law, and should therefore deny Russo's motion to reconsider. The Court's decision was as sound on August 19, 2020 as it is today.

                                          Respectfully submitted,

                                          SETH D. DuCHARME
                                          Acting United States Attorney

                       By:          /s/
                                          Andrey Spektor
                                          Lindsay K. Gerdes
                                          Assistant U.S. Attorneys
                                          (718) 254-6475/6155

cc:  Defense Counsel of record (by ECF)
      Clerk of the Court (NGG) (by ECF)