**JAMES R. FROCCARO, JR.**
Attorney at Law
20 Vanderventer Avenue, Suite 103W
Port Washington, NY 11050
telephone: (516) 944-5062
fax: (516) 944-5066
email: JRFESQ61@aol.com

December 8, 2020

BY ECF
Hon. Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re: United States v. Frangesco Russo
          20 Cr 306 (NGG)

Dear Judge Garaufis:

  This emergency motion is submitted on behalf of defendant Frangesco Russo seeking his temporary release from custody - pursuant to 18 U.S.C. Section 3142(i)(4) - in light of the recent COVID-19 outbreak at the Metropolitan Detention Center in Brooklyn (the "MDC"), where he is housed.[1] The MDC's most recent report to Chief Judge Mauskopf, submitted pursuant to Administrative Order No. 2020-14 on December 8, 2020, disclosed that 68 inmates have tested positive for COVID-19 in the last 7 days. Attached is a copy of the report. Based upon the figures

---

 [1] This statute provides, in sum and substance, that a judicial officer may subsequent to the issuance of a detention order permit the release of a defendant to the extent that the judicial officer determines such release to be necessary for a compelling reason.

1

provided, it appears that the positivity rate for COVID-19 test results returned in the last week stands at a disturbing 20% of the inmates tested.

      I did not represent Mr. Russo at the time of his prior bail proceedings before Your Honor.  I am aware, of course, of what transpired and that Your Honor found by clear and convincing evidence that he posed a danger to the community and should be detained.  I am not challenging this Court's findings herein.  Since I became involved, however, I learned that Mr. Russo suffers from a rare condition known as Reactive Airways Disease which places him at high risk for mortality if he is infected with the highly contagious COVID-19.  Attached hereto is a letter from Mr. Russo's primary care physician, Dr. Jim Hilepo, confirming this information.  As Dr. Hilepo explained in pertinent part in his letter:

> A hallmark symptom of reactive airways disease is wheezing. It is often associated with inflammation of the airways and concomitant bronchospasm and mucus congestion.  Other symptoms often include chest pain and difficulty breathing. These symptoms and clinical findings can compromise the patient's respiratory status.  The patient has experienced all of these symptoms in the past....
>
> The patient's above history places him at particularly high risk for severe illness and respiratory compromise and complications if he is exposed to and contracts COVID-19....

      I did not move for this relief earlier because of the low incidence of COVID-19 at the MDC.  The December 8 report to Chief Judge Mauskopf, however, demonstrates that the situation at the MDC has materially changed.  The virus is now spreading among the inmate population at an alarming rate - necessitating the instant request for emergency relief. As Your Honor is no doubt well aware, prior experience with similar outbreaks of COVID-19 at prisons nationwide, including FCI Fort Dix and

others, clearly indicates that the Bureau of Prisons is unable to adequately protect its charges from infection once the virus begins to spread within a facility in earnest. The recent outbreak of COVID -19 at the MDC - near 70 new cases over the last 7 days - clearly heightens the risk of Mr. Russo becoming infected with this deadly virus.

In light of the prevalence of COVID-19 at the MDC, Mr. Russo's continued confinement poses a significant risk to his health and a "compelling reason" for his temporary release under the Bail Reform Act. Mr. Russo's temporary release will no doubt substantially improve his chances of surviving the pandemic. Restrictive conditions, including 24-hour home incarceration with electronic monitoring,[2] coupled with a substantial bond secured by the homes of loved ones will serve to safeguard the community while he is on temporary release status.[3]

For the foregoing reasons, I am respectfully asking Your Honor to order Mr. Russo's immediate release on a temporary basis.

Respectfully submitted,

/JRF/

James R. Froccaro, Jr.

JRF:pa

---

[2] It is worth noting that Mr. Russo has no prior criminal record, and also, that there are no allegations of actual physical violence by Mr. Russo in the case, or in the past.

[3] The bail package being offered for his temporary release is a $2.5 million Bond, secured in large part by the primary residences of his mother-in-law and brother, and also, an additional investment property of his brother's. Mr. Russo's wife and mother are also willing, of course, to sign as additional suretors on the Bond.



**St. Francis Hospital
The Heart Center**
Catholic Health Services
At the heart of health

Phone: 516-775-4545
Fax: 516-775-4646

Steven Rucker, MD
Jim Hilepo, MD
Anthony Ardito, MD
Sharanjit Kaur DO
Tejas Patel, MD
Svetlana Iskhakova, NP

**Locations:**
1999 Marcus Avenue, Suite 216
Lake Success, New York   11042

500 Commack Road, Suite 150D
Commack, New York   11725

November 25, 2020

To Whom it May Concern:

Frank Russo, DOB 10/9/1981

The patient has been under my medical care for several years and has a history of reactive airways disease.

A hallmark symptom of reactive airways disease is wheezing. It is often associated with inflammation and irritation of the airways and concomitant bronchospasm and mucus congestion. Other symptoms often include chest pain and difficulty breathing. These symptoms and clinical findings can compromise the patient's respiratory status. The patient has experienced all of these symptoms in the past.

In general, causes of reactive airways disease include chronic asthma, recurrent bronchitis, congenital lung defects, cystic fibrosis, and pneumonia.
The patient has experienced upper respiratory infections as well as pneumonia in the past, all of which have exacerbated his reactive airways disease during those illnesses.

The patient's above history places him at a particularly high risk for severe illness and respiratory compromise and complications if he is exposed to and contracts COVID-19.

Please take this into consideration.
Thank you.

Sincerely,

RE:  Frank Russo

1

Jim N. Hilepo, MD

Electronically signed by: Jim N. Hilepo, MD on 11/25/2020



**U.S. DEPARTMENT OF JUSTICE**
**Federal Bureau of Prisons**
*Metropolitan Detention Center*

*80 29th Street*
*Brooklyn, New York 11232*

December 8, 2020

Chief Judge Roslynn R. Mauskopf
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

      Re:    **<u>Administrative Order No. 2020-14</u>**

Dear Chief Judge Mauskopf:

      The Court has ORDERED that the MDC and MCC respond to concerns about the institutions' response to the COVID-19 pandemic. Specifically, the Court asked about protocols for screening and testing inmates, staff and others entering or leaving each facility; the number of inmates tested and the number of positive tests; the number of staff and/or others testing positive; and all efforts undertaken to mitigate the spread of COVID-19 both generally and in response to any symptomatic inmate(s) and/or positive test(s).

      Staff have been tasked with screening each and every staff member who walks in the door at both facilities. Specifically, every staff member's temperature is taken, and the staff member is asked to answer several questions on a screening form. If the staff member has a fever or answers yes to any of the questions, a medical professional can deny entry to the institution.

      Medical staff are also screening new inmate arrivals[1] to the institution. Staff who are conducting the screening are required to wear appropriate personal protective equipment (PPE) in accordance with guidance promulgated by the Centers for Disease Control and Prevention (CDC). Inmates with a temperature greater than, or equal to, 100.4 degrees, or with overt respiratory symptoms, are placed in isolation. New arrivals with a temperature of less than 100.4 degrees are placed in quarantine for fourteen days as a precautionary measure.

      All new commitments are tested for COVID-19 upon entry. Those who are symptomatic are placed in isolation pending the test result. Those who are asymptomatic are placed in quarantine for fourteen days. New commitments are not released to general population without a negative test result. Inmates leaving either BOP facility are also screened and tested prior to leaving, unless they

---

[1] This includes inmates who have left the institution and returned—e.g., from a medical trip in the community.

The Honorable Roslynn R. Mauskopf
December 8, 2020
Page 2

are an immediate release.[2] All inmates who are being transferred or released are placed in quarantine for fourteen days prior to leaving the institution to ensure the safety of other inmates, staff and the community.

If an inmate tests positive, the housing unit(s) where the inmate was housed is/are placed on quarantine status. The Health Services department conducts contact tracing where inmates have been quartered within the last 48 hours before testing positive and initiate isolation procedures to mitigate possible spread. Inmates who test positive for COVID-19 are isolated for fourteen days, then re-tested to ensure a negative COVID-19 test result before being reintegrated into their cohort.

Any inmate currently in BOP custody who presents with COVID-19 like symptoms is assessed by institution health services staff. An inmate exhibiting symptoms consistent with COVID-19 will be placed in isolation. The remainder of the inmates on his or her unit will be quarantined to ensure additional inmates do not develop symptoms. Inmates who are in medical isolation will be evaluated by health services staff at least once a day. They will be removed from isolation status upon two consecutive negative test results. The inmates on a medically quarantined unit will undergo wellness and temperature checks twice a day to ensure additional inmates do not develop symptoms. The unit will be released from quarantine if the original symptomatic inmate's test result is negative, or after 14 days elapses with no additional inmates developing symptoms.

On April 1, 2020, the BOP enacted a national 14-day action plan to, among other things, increase social distancing in the facilities. Specifically, inmates in every institution are to be secured in their assigned cells. Since April 13, 2020, the BOP has continued to extend its April 1, 2020 action plan, with minor and gradual changes to reflect developments in the CDC and public health official guidance. At MDC and MCC, inmates will continue to be released from their cells several days per week in order to shower, use the phones, utilize the TRULINCs system, review discovery, and engage in recreation. This will continue to be done in small groups and social distancing has been required. Inmates are also required to wear their masks when they are out of their cells. The national action plan does not, however, affect the provision of legal phone calls. Inmates will still be taken out of their cells for legal phone calls.

Inmate orderlies continue to clean the common areas of all housing units, and inmates have been instructed to continue to wipe down and sanitize their living quarters.

MCC and MDC unit team staff and officers are available to the inmate population to address any and all issues, including medical concerns, property concerns, and/or food related issues. Unit team staff are providing legal calls to attorneys. Additionally, any inmate can also request medical care from health services providers when they make rounds on the housing units.

All staff are required to wear the appropriate personal protective equipment (PPE), to include

---

[2] Accordingly, if and when the numbers of inmates tested seems to increase dramatically, it likely coincides with the arrival of new commitments to either facility, or transfer or release of inmates from the facilities.

The Honorable Roslynn R. Mauskopf
December 8, 2020
Page 2

masks, on a daily basis. Each staff member has been trained on proper donning and doffing techniques. Additionally, each staff member is offered a mask, on a daily basis, upon entrance into the facility. The Executive staff and supervisors monitor the wearing of appropriate PPE by staff through daily rounds, informational emails, and conference calls. All staff are screened when entering the institution. Staff must pass routine screening questions, and their temperatures are taken. Staff are not permitted to enter the institution if they fail any of the screening procedures.

Please be advised that the following numbers constitute a running tally, which began on March 13, 2020.

With regard to the numbers as of December 8, 2020, for MDC[3]:

Inmates Tested: 3213
Inmates Positive: 93
Staff Positive: 50

With regard to the numbers as of December 8, 2020 for MCC:

Inmates Tested: 2238
Inmates Positive: 60
Staff Positive: 50

Respectfully submitted,

/s/

H.
Tellez
Warden
MDC Brooklyn

/s/

M. Licon-Vitale
Warden
MCC New York

---

[3] The additional positive results since the last letter, are the results of continued extensive testing of the individuals in affected unit.